## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **HENRY L. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-211 (RCL)** |
| | ) | |
| **MICHAEL CHERTOFF, Secretary,** | ) | |
| **Department of Homeland Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

### MEMORANDUM OPINION

This matter comes before the court on defendant's motion for summary judgment [26]. The Court has considered defendant's motion [26], plaintiff's opposition thereto [68], defendant's reply [77], the entire record herein, and the applicable law.  For the reasons set forth below, defendant's motion will be GRANTED.

### BACKGROUND

When he filed his complaint with this Court, plaintiff Henry L. Williams, an African-American male, was forty-nine years old.  (Pl.'s Compl. 2.)  Williams had served twenty-two years as a United States Secret Service Officer and was then part of the Dignitary Protection Division ("DPD").  (*Id.*)  His duties included patrolling an assigned "sector" in a police cruiser, usually with a partner in the vehicle, and checking security at specific diplomatic locations at appointed times.  (Pl.'s Ex. 2 at 17; Pl.'s Ex. 8 at 44, 98.)

On January 28, 2005, Williams filed a complaint [3] in this Court against his employer, then-Secretary of Homeland Security Thomas J. Ridge, in his official capacity, alleging

1

numerous instances of race and age discrimination in violation of 42 U.S.C. § 2000e-16 ("Title VII") and 29 U.S.C. § 633a ("the ADEA"), respectively.  (Pl.'s Compl. 1-2, 6-7.)  Williams also alleged retaliation for his participation in the EEOC hearing process and asserted a hostile work environment claim under Title VII. (Pl.'s Compl. 7.)  Defendant moved to dismiss [3] for failure to state a claim on April 15, 2005.

On November 1, 2005, this Court dismissed [9] plaintiff's race and age discrimination claims as to events prior to October 6, 2002 for failure to bring timely administrative action. *Williams v. Chertoff*, No. 05-211, 2005 U.S. Dist. LEXIS 38847, at *4-5 (D.D.C. Nov. 1, 2005) (Lamberth J.).  The Court also dismissed plaintiff's retaliation claim but permitted his hostile work environment claim to proceed.  *Id.* at *8-9.

Two weeks later, defendant filed his answer [10], and on November 15, 2006, a motion for summary judgment [26].  Plaintiff opposed this motion [68] on January 8, 2007, and defendant replied [77] on April 10.  The motion reaches both remaining claims: 1) race and age discrimination in suspending plaintiff for nine days on November 14, 2002; and 2) hostile work environment.[1]  These claims rest on a series of events that began March 3, 2002.

---

[1] Defendant asks the Court to "consider alternative grounds" for its judgment dismissing plaintiff's retaliation claim with prejudice.  (Def.'s Mem. Supp. Mot. Summ. J. 16.)  Since this Court issued its order in November 2005, first the D.C. Circuit and then the U.S. Supreme Court have adopted a new standard for what constitutes unlawful retaliation under Title VII, redefining it to include any employer action that would likely have dissuaded a reasonable worker in the plaintiff's position from engaging in the protected activity.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006); *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (2006).  This Court dismissed plaintiff's retaliation claims because they did not meet the prior standard, which defined unlawful retaliation more strictly as "tangible change in the [claimant's] duties, conditions, or terms of employment."  *Williams v. Chertoff*, No. 05-211, 2005 U.S. Dist. LEXIS 38847, at *7-8 (D.D.C. Nov. 1, 2005) (Lamberth J.).  Defendant cites this intervening change in the law as the impetus for his request.  (Def.'s Mem. Supp. Mot. Summ. J. 16.)

The Court declines this request for several reasons.  First, defendant prevailed on this

point, and plaintiff has neither moved for reconsideration under nor sought leave to amend his complaint to restore a retaliation claim.  *See* Fed. R. Civ. Pro. 59(e) (limiting motions to alter or amend a judgment to within ten days after its entry); Fed. R. Civ. Pro. 15(a) (party must seek leave of court or opponent's written agreement to amend his pleading after a responsive pleading is served).  A footnote in plaintiff's opposition insists he "retains a viable claim for retaliation as pled in his complaint" and characterizes this court's dismissal as "no longer tenable."  (Pl.'s Mem. Opp. Summ. J. 8 n.3.)  But a footnote is not a motion, and plaintiff's claim is no longer before the Court.  The Court is aware of no basis on which defendant can claim standing to resurrect this issue.  *Cf.* N.D. Cal. Civ. R. 7-9 ("any party" may move for reconsideration); Local Rule 72.2 ("any party" may move for reconsideration of *a magistrate judge's* order).

Second, plaintiff, understandably, has not fully briefed the issue, and the alternative theory of recovery defendant posits on his behalf is not pled in his complaint.  (*See* Def.'s Mem. Supp. Mot. Summ. J. 24-25 (analyzing the supposed "opposition" claim); Pl.'s Compl. 5-6 (alleging retaliation only based on plaintiff's "participation in the EEOC hearing process").)

Third, at least one court in this district has denied a properly filed motion for reconsideration premised on *Burlington Northern* and *Rochon*'s change in the law.  *See Stanford v. Potomac Elec. Power Co.*, No. 04-1461, 2007 U.S. Dist. LEXIS 5685 (D.D.C. Jan. 26, 2007) (Walton, J.).  As that court astutely observed, neither *Burlington Northern* nor *Rochon* was "made explicitly applicable to previously decided cases" like this one.  *Id.* at *11.

Fourth and finally, even assuming (without deciding) that this new standard *does* apply retroactively, plaintiff's claim would still fail.  His complaint describes two forms of retaliation: first, despite an informal policy against writing tickets, his supervisors allegedly "berated him" for issuing too few; second, "management" allegedly told "his co-workers that he had cursed at his supervisors and . . . would be written up or terminated for his actions."  (Pl.'s Compl. 5-6.)

These actions would not dissuade a reasonable employee from filing an EEOC complaint. *See*, *e.g.*, *Burlington Northern*, 126 S. Ct. at 2415 ("petty slights, minor annoyances," and "snubbing" by supervisors and peers not actionable); *Cross v. Small*, No. 04-1253, 2006 U.S. Dist. LEXIS 71769, at *34, *35 n.8 (D.D.C. Sept. 29, 2006) (Collyer, J.) (no reasonable employee would be dissuaded by, inter alia, supervisor's yelling at him and confronting him in front of coworkers); *Gardner v. District of Columbia*, 448 F. Supp. 2d 70, 76 (D.D.C. 2006) (Urbina, J.) (no reasonable employee would be dissuaded by, inter alia, supervisor's hostile treatment, slamming phone down during her calls, and angry glaring).  Thus, Williams' retaliation claim would fail under *Burlington Northern* and *Rochon*.

Moreover, by Williams' own account, he filed his EEOC complaint well after Sergeant Angerome allegedly yelled at him and humiliated him over the common DPD radio system. (Pl.'s Ex. 3 at 3-4.)  Logically, he cannot now claim that similar conduct would have deterred him.  Further, Williams admits to cursing at his supervisor in the presence of other officers on a public street.  (Pl.'s Ex.13 at 1; Pl.'s Ex. 29 at 1.)  He apparently told his colleague Chappell that he had been "written up" soon after the incident.  (Pl.'s Ex. 7 at 3.)  Hence, Williams alleges management told his colleagues no more than he had already disclosed on his own.

3

*1. Confrontation Between Officer Williams and Sergeant Angerome*

On the night of March 2, 2002, plaintiff and Officer Curtis Chappell, who is also African-American, were assigned to conduct patrols in Cruiser 1B1.  (Pl.'s Ex. 7 at 1, 2.)  Without seeking authorization from their supervisors, Chappell switched vehicles to ride with a different partner.  (*Id.*; Pl.'s Ex. 2 at 69.)  Officer Nathan Judd rode with Williams until approximately 2:10 a.m. on March 3, after which Williams patrolled alone.  (Pl.'s Ex. 2 at 17; Pl.'s Ex. 3 at 2.)

As occasionally happened, the communications system linking DPD cruisers failed that night, causing Cruiser 1B1's radio to malfunction.  (Pl.'s Ex. 3 at 2; Pl.'s Ex. 5 at 54; Pl.'s Ex. 6 at 39-40.)  Before Williams dropped Judd at the Control Center ("CC"), he heard CC attempting to locate a cruiser over the radio.  (Pl.'s Ex. 3 at 2.)  When Williams queried the operator, he learned *he* was the object of the search.  (*Id.*)  Williams' supervisor, Sergeant Anthony Angerome, a White Hispanic male, overheard this exchange.  (*Id.*)  He asked when the search had begun and discovered that CC had been searching for Williams since 1:52 a.m, approximately ten to fifteen minutes earlier.  (*Id.*)  Judd advised CC of Cruiser 1B1's radio problems after Williams dropped him off.  (Pl.'s Ex. 1 at 2.)

Some minutes later, Angerome learned from Chappell that Chappell had switched vehicles without authorization, and though he called for a meeting at CC to discuss the matter, Williams did not respond.  (Pl.'s Ex. 7 at 2.)  At CC, Angerome directed Chappell to remove his belongings from the other cruiser and to join him in his cruiser.  (Pl.'s Ex. 7 at 2.)  According to Chappell, all units were then searching for Cruiser 1B1.  (*Id.*)

Sometime before 3:00 a.m., Williams was on Massachusetts Avenue, outside his assigned patrol sector, when he stopped to give directions to two tourists.  (Pl.'s Dep. 38; Pl.'s Ex. 3 at 2.)

4

Moments before, Williams had heard Angerome call him over the radio to ask for his mileage and location. (*Id.*) Williams had responded, providing his mileage and giving his location as "19th and Wyoming," a common meeting point for officers and supervisors. (*Id.*; Pl.'s Ex. 2 at 33.) Though Williams declares he intended to drive to that location, he was not there when Angerome arrived, and Angerome again contacted him over the radio to request his mileage and location. (*Id.* at 52; Pl.'s Ex. 3 at 2.) When Williams provided his true location, on Massachusetts Avenue, Angerome instructed Williams to await him there.[2] (*Id.*)

Angerome met Williams on Massachusetts Avenue somewhere between 20th Street and Sheridan Circle. (*See* Pl.'s Ex. 7 at 2; Pl.'s Ex. 9 at 8; Pl.'s Ex. 24 at 3.) The precise details of the confrontation that followed are unclear. According to Williams, Angerome slammed his cruiser door and approached Williams in "an extremely agitated state." (Pl.'s Ex. 3 at 3; Pl.'s Ex. 13 at 1.) He claims Angerome "started yelling" at him, demanding to know where he had been.

---

[2] Williams' evidence is inconsistent as to several aspects of this radio exchange, and he points to these in his opposition to defendant's motion for summary judgment. (Pl.'s Mem. Opp. Summ. J. 16, 21.) First, the CC operator who listened to the exchange believed Williams' tone was unprofessional, (Pl.'s Ex. 25 at 302-03), but Lieutenant Joseph McBride, who also overheard some portion of the dialogue, described Williams' tone as merely "matter of fact," (Pl.'s Ex. 6 at 53). Second, Williams alleges that Angerome "yelled" for his mileage and location "in a very demeaning tone" and seemed "agitated and upset," (Pl.'s Ex. 2 at 55; Pl.'s Ex. 3 at 2), but McBride described Angerome's "demeanor" over the radio as "average," (Pl.'s Ex. 6 at 53). Third, Williams claims that it was both unusual and inappropriate for Angerome to ask for location and mileage over the radio, particularly from a "senior officer." (Pl.'s Ex. 2 at 55; Pl.'s Ex. 3 at 2.) Other officers have suggested various reasons for such a request, (*see* Pl.'s Ex. 5 at 40; Pl.'s Ex. 6 at 48; Pl.'s Ex. 8 at 36; Pl.'s Ex. 9 at 27-28), but Williams contends it had "no legitimate basis" and derived from an "invidious reason," (*see* Pl.'s Mem. Opp. 21).

Plaintiff correctly identifies these factual issues as disputed. The first two issues, however, are not *material*: the propriety of Williams' radio conduct and the volume and tone of Angerome's transmissions do not bear directly on whether Williams was properly suspended for his subsequent conduct. The Court will address the third issue in its analysis, below.

5

(Pl.'s Ex. 2 at 58; Pl.'s Ex. 3 at 2.)  Officer Chappell, who was in Angerome's vehicle and who observed the encounter, recalled not hearing what Angerome said to Williams, and he noted only that Williams "was not happy" about it.  (Pl.'s Ex. 7 at 2.)

Chappell recalled that Williams then "started to speak loud [sic] with Sgt. Angerome." (*Id.*)  The parties do agree on this aspect of Williams' conduct: in a raised voice, Williams declared Angerome would not have requested his location and mileage over the radio, nor would he have yelled at him, had Williams been one of three white officers, whom he named.  (Pl.'s Ex. 3 at 3.)  He accused Angerome of being a racist, (*id.*), and declared that "a black man was always being f***** with," (Pl.'s Ex.13 at 1; Pl.'s Ex. 29 at 1).

According to Angerome, Williams then launched a profanity-laden tirade in which he demanded to know why "people were after him" and insisted he was the victim of race discrimination.  (Pl.'s Ex. 31 at 3.)  Williams' account implies he continued to speak in a raised voice but does not offer an alternative version of what he said.  (Pl.'s Ex. 3 at 3 (Pl.'s Aff.) ("Sgt. Rosa showed up shortly afterward and [] asked me to lower my voice").)

Sergeant Richard Rosa, whose ethnicity is not part of the record, and Lieutenant Joseph McBride, who is white, arrived at the scene some moments later, and both reported hearing Williams make generalized allegations of racial discrimination and harassment.[3]  (Pl.'s Ex. 6 at

---

[3]  It is unclear from the evidence where Williams was standing and how he behaved during this speech, and plaintiff offers this as a genuine, material issue precluding summary judgment.  (Pl.'s Mem. Opp. Summ. J. 17-18.)  He now claims he never left "the sidewalk area." (*Id.* at 5.)  Captain Michael Carey, McBride's supervisor, later wrote and testified that McBride had told him Rosa had been forced to direct traffic around Williams, and this detail appears in the paper trail leading to Williams' suspension.  (*See* Pl.'s Ex. 5 at 64 (Carey Dep.); Pl.'s Ex. 28 at 1 (Proposed Suspension Ltr., May 7, 2002); Pl.'s Ex. 31 at 1 (Carey Memo. Seeking Disciplinary Recommendation, Mar. 4, 2002).)

64; Pl.'s Ex. 9 at 63.)  Rosa had heard Williams and Angerome's earlier radio exchange and

stated that because he "knew [Williams] was somewhat agitated and bothered," he drove to

Massachusetts Avenue "to just help diffuse things if possible."  (Pl.'s Ex. 9 at 58.)  Angerome

summoned McBride, who was the watch commander that night and who arrived after Rosa, by

radio.  (Pl.'s Ex. 3 at 3; Pl.'s Ex. 8 at 82.)  When McBride arrived, he spoke with first Angerome

and then Williams.  (Pl.'s Ex. 2 at 79, 84.)  McBride directed Williams to remove his belongings

from Cruiser 1B1 and to accompany him back to CC.  (*Id.* at 84.)

    *2. Management's Response to the Confrontation*

        *a. Anger Management Class*

Soon after this incident, Williams' chain-of-command referred him to the Employee

Assistance Program ("EAP"), which "provid[es] counseling services to employees and their

families."  (Pl.'s Ex. 34 at 1.)  Counselor Helen Pitts, an African-American female, met with

Williams and arranged for him to attend an anger management class in April 2002.  (*Id.* at 1-2.)

---

Rosa, however, directly contradicted this detail in his deposition.  (Pl.'s Ex. 9 at 64.)
Instead, he remembers encountering Williams "between the passenger and the trunk . . . on the
driver's side" of Cruiser 1B1, and though Rosa "motioned him to get on the sidewalk," Williams
returned to the roadway, "pacing back and forth."  (Pl.'s Ex. 9 at 61, 63.)  Chappell, who watched
from Angerome's cruiser, noted that "[w]hen [] Williams was talking he was standing in between
both cars" but that after approaching Angerome's vehicle at one point to speak with Chappell,
Williams "returned to the sidewalk."  (Pl.'s Ex. 7 at 2.)  In a written statement given March 4,
2002, Angerome stated that Williams "ranted and raved walking in and out of Massachusetts
Ave." (Pl.'s Ex. 31 at 3.)  McBride recalled that when he arrived at the scene, "Williams was in
the middle of the street" and was "waving his arms about."  (Pl.'s Ex. 6 at 57; Pl.'s Ex. 10 at 1.)
    Plaintiff admits to raising his voice and cursing to his supervisor while on duty, in
uniform, in or near a public street.  (Pl.'s Ex. 3 at 3; Pl.'s Ex. 13 at 1; Pl.'s Ex. 29 at 1.)  His
establishment of his precise location and arm movements during this speech would in no way
raise an inference that the Secret Service unlawfully discriminated in disciplining him for it.
Hence, the inconsistencies he identifies are not *material* issues.

### b. Proposed Suspension

The U.S. Secret Service's discipline policy is set out in its Human Resources and Training Manual. (Pl.'s Ex. 12 at 2.) Typically, an employee's superiors provide information concerning incidents of misconduct to the Employee Relations Branch ("ERB"), which assigns an investigator to "research[] the case" and determine whether any regulations have been violated. (*Id.* at 2-3; Pl.'s Ex. 29 at 9, 28-29.) If the investigator concludes a violation has occurred, he then reviews the employee's past disciplinary record, weighs "similarly situated cases," and drafts a letter for the employee's supervisor's signature detailing the proposed discipline.[4] (*Id.* at 9, 31.)

On March 4, 2002, Carey sent a memorandum summarizing the previous night's events to ERB and requested they recommend appropriate disciplinary action. (Pl.'s Ex. 31 at 1-2.) Specialist Jack Kinnear reviewed Carey's submission, which included statements from Angerome and McBride, as well as Williams' own statement and Williams' prior disciplinary record. (Pl.'s Ex. 29 at 25, 29-30.) Williams' record included one prior disciplinary action: in October 1997, Williams "engaged in an argument" with another Secret Service employee, resulting in five-day suspensions for both men. (Pl.'s Ex. 30 at 2-3.) Secret Service policy

---

[4] In his Statement of Genuine Issues, plaintiff disputes that the Secret Service followed its own procedures in disciplining him and suggests that his own chain of command, whom he accuses of discrimination, and DSAIC Knight should have investigated the events of March 3 more fully. (Pl.'s Statement of Genuine Issues 2; Pl.'s Mem. Opp. Summ. J. 22-30.) Yet he cites no evidence that Secret Service procedures provide for any investigation other than that conducted by ERB. Plaintiff also contends the Secret Service did not "properly" rely on his past disciplinary record, suggesting it should have investigated prior incidents. (*Id.* at 23-25.) It is unclear whether plaintiff alleges these were not properly investigated when they occurred or should have been re-investigated when new discipline was considered. Either way, he neither cites a specific breach of procedure nor identifies a materially false statement in his record.

prescribes progressively severe disciplinary action. (*See, e.g.*, Pl.'s Ex. 27 at 74.)  When an officer's misconduct occurs publicly, so as to tarnish the Secret Service's image, this serves as an aggravating factor.  (Pl.'s Ex. 29 at 11-12.)

Specialist Kinnear determined Williams had violated one section of the Human Resources and Training Manual and two sections of the Uniformed Division Manual, each of which mandates courteousness, decorum, and otherwise professional behavior at all times, particularly toward other officers.[5]  (Pl.'s Ex. 28 at 2.)  In late April, he recommended to Carey that Williams be suspended for ten days.  (Pl.'s Ex. 13 at 7; Pl.'s Ex. 28 at 1.)

In a May 7 email, Carey observed that Williams had seemed calmer since completing the anger management course and characterized a ten-day suspension as too severe.  (Pl.'s Ex. 13 at 7.)  That same day, Carey presented the proposed ten-day suspension to Williams.  (*See* Pl.'s Ex. 28 at 1-4.)  McBride and Angerome joined Williams and Carey at this meeting.  (Pl.'s Ex. 2 at 102.)  Carey indicated he would hold the suspension in abeyance if Williams attended further anger management courses.  (*Id.* at 104, 106; Pl.'s Ex. 10 at 2.)

At this point, the participants' account diverge.  Williams claims McBride and Angerome threatened to retaliate against him if he were to file an EEO complaint.  (Pl.'s Ex. 3 at 3.)  The evidence before the Court does not include Angerome's recollection of this meeting.  (*See* Pl.'s

---

[5] Specifically, Training Manual section PER-05(05) provides that "[c]ourtesy or daily behavior that is polite and considerate of others, is required of Secret Service and other Treasury employees in all their dealings with . . . other Federal employees."  (Pl.'s Ex. 28 at 2.) Uniformed Division Manual section UND-15 states: "[i]t is the duty and responsibility of members to promote harmony among their associates and between subordinates and superior officers."  (*Id.*)  Section UND-16 provides that "[a]ll members, regardless of their position should ensure that every individual with whom they have contact is treated professionally. Members shall at all times maintain decorum and command of temper."  (*Id.*)

Exs. 8, 26.)  McBride, however, denies making any such threat.  (Pl.'s Ex. 10 at 2.)  He recalls, instead, that Williams "stated that he wanted the suspension" and then used hand motions to indicate his skin color, observing "it would always be white against black."  (*Id.*)  Carey described a similar meeting in his deposition, although it is unclear from the excerpts provided when this meeting occurred.[6]  Carey described the May 7 meeting using strikingly similar language in a May 8 email to ERB.  (Pl.'s Ex. 13 at 6.)  In the email, Carey declared that his "initial assessment of Officer Williams was wrong[;]" that he believed Williams was "paranoid and easily agitated[;]" and that he believed Williams had not "learned anything from the anger management classes thus far."  (*Id.*)  Carey further stated that he now agreed with the proposed ten-day suspension.  (*Id.*)

On May 17, 2002, Williams responded in writing.  (*See* Pl.'s Ex. 13.)  He disputed how the proposal characterized his confrontation with Angerome, alleging that Angerome's

---

[6]  Carey described this meeting as follows:

Q. Just for the record, about what time of night was this?

A. Somewhere around two o'clock in the morning I think.  And it's all kind of a blur because they were just – Henry was hollering and Angerome was hollering.  And Joe and I are kind of sitting there like what the heck's going on here.  And the next thing I know we're sitting there and Henry does this (indicating).  He doesn't say a word.  He lifts up his hands and he just stares at them.  He starts doing this (indicating).  And I said, "Henry, what are you doing?"  And he says, "I know what's going on here."  And he just keeps staring at his hands.

Q. What did you interpret him to be saying or meaning?

A. Well, I said, "What's that supposed to mean?"  And he says, "I know what's going on here.  I'm black and you are all white."

(Pl.'s Ex. 5 at 64-65.)

"unprofessional and confrontational behavior . . . was racially motivated," but he admitted he had been upset, raised his voice, and used profanity.  (*Id.* at 1.)

### c. Fitness For Duty Examination

Four days later, Williams "was relieved of [his] weapon and given limited duties,"(Pl.'s Ex. 3 at 3), "based on a pattern of unacceptable behavior displayed . . . over the course of the past few years," (Pl.'s Ex. 15).  Though plaintiff consistently refers to his status as "limited duty," (*see*, *e.g.*, Pl.'s Ex. 3 at 2; Pl.'s Compl. at 4, 5), the receipt he received for his weapon reads "restricted duty," (Pl.'s Ex. 14).  According to Robert Knight, DPD's Deputy Special Agent in Charge ("DSAIC"), "an individual is placed on limited duty for a medical reason, while an individual is placed on restricted duty for conduct issues."  (Pl.'s Ex. 11 at 9.)

Soon thereafter, Knight became DSAIC and decided to order Williams to undergo a fitness for duty examination ("FFD").  (*Id.*)  Knight relied on Angerome's description of Williams' March 3, 2002 conduct as well as the suspension proposal's recounting of that night's events, but he also reviewed Williams initial written statement and his response to the proposed suspension.  (Pl.'s Ex. 27 at 22, 23, 47.)  Further, Knight knew about Williams' 1997 suspension and that a Maryland National Capital Park Police officer had complained to the Secret Service about an encounter with Williams.[7]  (Pl.'s Ex. 11 at 4-5.)

------

[7] Williams described this encounter as follows:

A member of the Maryland National Capital Park Police pulled [me] over[] and asked for [my] identification.  When [I] reached for [my] identification, the member of the Maryland National Capital Park Police pulled his revolver[] and aimed at [me].  The Police Officer was concerned that [I], who the Police Officer discovered was a member of the Secret Service, was going to report him for pulling his weapon without provocation. No ticket was issued.

Knight determined that Williams' "history appeared to suggest that [he] might be subject to outbreaks of anger which did not seem to be under control, and that could impact upon his duties as a Secret Service Uniformed Division officer." (Pl.'s Ex. 11 at 3.)  Knight states he was particularly concerned about Williams' fitness for duty because Williams' job requires him to carry a firearm, provides him with access to high-level domestic and foreign government officials, and empowers him to make arrests. (*Id.* at 5.)

On June 5, 2002, Knight ordered Williams in writing to complete the FFD. (*See* Pl.'s Ex.15.)  An FFD is a medical examination that includes both physical and psychological components. (*See id.*)  Williams visited three physicians, and on July 19, 2002, the reviewing physician at the Department of Health & Human Services drafted his final report. (*See* Pl.'s Ex. 16.)  The reviewing physician concluded that Williams was medically fit for duty, "without restriction or accommodation," and that he "should be encouraged to continue in counseling . . . and to participate in anger management classes/therapy for the next six months." (*Id.* at 3.)  Williams returned to full duty on July 23, 2002. (*See* Pl.'s Ex. 18.)

In his complaint and deposition, Williams describes events he alleges occurred after Knight ordered him to undergo the FFD.  Williams claims "everybody" mocked him, "calling [him] a crazy man" and asking if he was "taking [his] meds today." (Pl.'s Ex. 2 at 108.)  In his deposition, Williams listed three officers, including McBride, who asked him if he was "on [his] meds." (*Id.* at 126.)  He also alleges someone placed "a picture drawn of [him] with a cap and gown saying hey, congratulations, you graduated from Psych[] 101" on his locker, which was

_____

(Pl.'s Ex. 30 at 4-5.)  The stop occurred in April 2001, and the Park Police complained to the Secret Service that same month. (*Id.*)

visible from the locker room entrance.  (*Id.* at 124, 126.)  Williams further contends he felt

isolated because his fellow officers no longer wanted to be near him.[8]  (*Id.* at 128.)

     *d. Suspension*

In late July 2002, when Williams returned to active duty, DSAIC Knight had not yet

decided to issue the proposed suspension, having held it in abeyance pending the FFD results.

(Pl.'s Ex. 11 at 3.)  Knight recalls learning these results in July or August 2002.  (Pl's Ex. 11 at

5.)  In August, ERB reissued the suspension proposal "with [Knight] as the deciding official,"

which reset "the clock" for processing the suspension.  (Pl.'s Ex. 27 at 83.)  Although Williams

did not respond verbally to the proposed suspension within the allotted time, on or about August

22, 2002, Knight claims he sought Williams out during his midnight shift and offered him the

---

[8] Williams testified as follows:

Q.  How were you isolated?

A.  How was I isolated?  After that nobody want to be like within ten feet or five feet of
me, you know, when they're around officials and stuff.

Q.  How do you know?

A.  I was there.  I'm the victim.  I was there.

Q. What happened?  How did you know they wanted to stay away from you?

A. Okay.  Let me give you an example.  We got a brand new recruit, just came on the job,
just came on the job.  Okay.  He needed to be OJT.  We get in the cruiser.  We riding
around, talking.  He all happy, cheerful, enjoying the things that I'm telling him.  And
then – that's his first day.  His second day he come back.  I guess someone done told him
be careful of [me], he's a nut, blah, blah.  The kid act like I'm a total stranger, didn't even
want to speak to me.  We had ridden in a cruiser all night one night and the next day, you
know, he just totally clammed up.

(Pl.'s Ex. 2 at 128-29.)  He could not name the recruit and could not specifically identify who
might have told the recruit he was "a nut."  (*Id.* at 129.)

opportunity to verbally amplify his written response. (Pl.'s Ex. 11 at 6.)  Williams declined.  (*Id.*)

In deciding to issue the suspension, Knight weighed several pieces of evidence and other factors.  First, he reviewed all available witness statements and memoranda concerning the March 3 confrontation, including those from Williams and "his witness," Chappell.  (*Id.* at 6; Pl.'s Ex. 27 at 76.)  Second, he reviewed Williams' written response to the suspension proposal.  (Pl.'s Ex. 11 at 6.)  Third, he considered Williams' five-day suspension in 1997 and the Secret Service policy mandating progressive discipline.  (Pl.'s Ex. 27 at 74-75.)  Fourth, Knight weighed the public setting of Williams' conduct and the fact that it was directed at his supervisor.  (*Id.* at 79.  *See also* Pl.'s Ex. 12 at 2 (fact that "misconduct occurred in public causing embarrassment to the Secret Service" affected ERB's suspension recommendation).)  He did not consider Williams' attendance at the anger management course and counseling, the fitness for duty finding, or Williams' belief that he was being treated in a discriminatory manner.  (*Id.* at 76-77.)

Knight decided to issue the suspension on or about November 14, 2002, when he signed the suspension memorandum.  (*Id.* at 82.)  Although he does not now recall why, he reduced its duration from ten days to nine.[9]  (*Id.* at 76.)  Williams received notice of the suspension on November 14 and served it from December 2 through December 10, 2002.  (Pl.'s Ex. 3 at 4; Pl.'s Ex. 20.)  He first contacted an Equal Opportunity Officer on November 20 and filed his formal EEOC complaint on March 3, 2003.  *Williams*, 2005 U.S. Dist. LEXIS 38847, at *3.

---

[9] In his Statement of Genuine Issues, Williams "admits that the deciding official reduced the proposed 10-day suspension to a nine-day suspension.  Plaintiff disputes the reasons stated."  (Pl.'s Statement of Genuine Issues 2.)  It is unclear to the Court how plaintiff disputes Knight's reasons when he provided none.

14

As noted, Williams filed his complaint in this Court on January 28, 2005, and in November 2005, the Court dismissed his race and age discrimination claims as to events prior to October 6, 2002 and his retaliation claim.  Defendant now seeks summary judgment on Williams' remaining discrimination and hostile work environment claims.

## DISCUSSION

### I. Legal Standard for Summary Judgment

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial.  Fed. R. Civ. Pro. 56(c).  To ascertain whether an issue involves "material" facts, a court must look to the substantive law on which the claim or defense rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense.  *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  Where "the nonmoving party [] fails[] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

In deciding a motion for summary judgment, a court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor.  *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ."  *Id.* at 255.  Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Id.* at 252.  The summary judgement standard is "'very close' to the 'reasonable jury' directed verdict

standard," and despite their different procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250-51.

## II. Race and Age Discrimination

### A. Applicable Legal Standards

#### 1. Plaintiff's Prima Facie Case

The same essential elements comprise a prima facie case under both Title VII and the ADEA. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (prima facie case of race discrimination under Title VII in failure to hire scenario)[10]; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (assuming the *McDonnell Douglas* standard also applies to age discrimination claims under the ADEA); *Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C. Cir. 1982) (applying *McDonnell Douglas* to ADEA claims).[11]

Where the alleged discrimination does not consist of failure to hire, this Circuit applies a more generalized formula. *See Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). In such

---

[10] In the typical failure-to-hire case, a plaintiff carries the initial burden of showing: 1) that he belongs to a protected class; 2) "that he applied and was qualified for a job for which the employer was seeking applicants;" 3) that the employer rejected his application despite his qualifications; and 4) that thereafter, "the position remained open[,] and the employer continued to seek applicants from persons of [his] qualifications." *McDonnell Douglas*, 411 U.S. at 802.

[11] A plaintiff may, of course, offer direct evidence of discrimination, thus preempting application of the *McDonnell Douglas* burden-shifting framework. *Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111, 121 (1985). Williams evidently concedes he is unable to do so. (*See, e.g.*, Pl.'s Mem. Opp. Summ. J. 10-11 (discussing plaintiff's prima facie case in terms of *McDonnell Douglas*).)

cases, the plaintiff need only show: 1) that he is a member of a protected class[12]; 2) that he "suffered an adverse employment action"[13]; and 3) that "the unfavorable action gives rise to an inference of discrimination." *Id.*  Only the third element is at issue here.

To establish this third and final element of his prima facie case, the plaintiff must draw some nexus between the first two elements from which the fact-finder could infer discriminatory purpose. *McDonnell Douglas*, 411 U.S. at 802.  He may, for example, "demonstrat[e] that []he was treated differently from similarly situated employees who are not part of the protected class."

---

[12] Under Title VII, plaintiff must show he is "a racial minority."  *McDonnell Douglas*, 411 U.S. at 802.  Under the ADEA, he must be at least forty years of age.  29 U.S.C. § 631(a) (2007).  Plaintiff is African-American and was forty-nine years old when he filed this action.

[13] Not every subjectively unfavorable personnel action qualifies.  *Brown v. Brody*, 199 F.3d 446, 455-57 (D.C. Cir. 1999).  Rather, plaintiff must establish:

> . . . a significant change in employment status, such as hiring, firing, failing to promote, reassignment to significantly different responsibilities, or a decision causing a significant change in benefits.  Compare *Crady v. Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with *Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (7th Cir. 1994) (a "bruised ego" is not enough); *Koscis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (demotion without change in pay, benefits, duties or prestige insufficient) and *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

*Id.* at 456-57 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  In this Circuit, lateral transfers, poor performance evaluations, and formal criticism do not constitute "adverse employment actions" unless they negatively impact the terms or conditions of employment by, for example, precipitating salary cuts. *Id.* at 458.

*George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  Alternatively, in a failure to hire case, the

plaintiff may satisfy this third element by ruling out "'the two most common legitimate reasons

on which an employer might rely to reject a job applicant: an absolute or relative lack of

qualifications or the absence of a vacancy in the job sought.'" *Stella v. Minetta*, 284 F.3d 135,

145 (D.C. Cir. 2002).  By analogy, in a discharge case, the plaintiff may show his termination is

not attributable to "performance below the employer's legitimate expectations or the elimination

of the plaintiff's position altogether."  *George*, 407 F.3d at 412.  Extending this analogy, the most

common legitimate reason on which an employer might rely in disciplining an employee would

be that the employee had violated an employment regulation or policy.

### 2. Defendant's Non-Discriminatory Reason

Once the plaintiff has established a prima facie case, the burden shifts to the defendant,

who must then "articulate some legitimate, nondiscriminatory reason" for the adverse

employment action.  *McDonnell Douglas*, 411 U.S. at 802.  This burden is one of production

rather than proof.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The

defendant "need not persuade the court that it was actually motivated by the proffered reasons"

but rather need only "raise[] a genuine issue of fact as to whether it discriminated against the

plaintiff."  *Id.*

### 3. Plaintiff's Pretext Showing

The burden then shifts back to the plaintiff, who must prove by a preponderance of the

evidence that the defendant's proffered reasons are mere pretext for discrimination.  *Id.* at 253;

*McDonnell Douglas*, 411 U.S. at 804.  Typically, the plaintiff seeks to prove that the employer

treated similarly situated employees outside the protected class more favorably, *see id.*, but this is

not the sole means of showing pretext, *see* 1 Lex K. Larson, *Employment Discrimination* § 8.04

(2d ed. 2005).

### 4. Fact-finder's Evaluation of the Evidence

Once the plaintiff has offered some evidence to rebut the employer's professed non-

discriminatory reason, he need not necessarily present anything more.  *See Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133 (*2*000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if
> disbelief is accompanied by a suspicion of mendacity) may, together with the elements of
> the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the
> defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of
> intentional discrimination.

*Id.* at 511 (emphasis in original).  The fact-finder may reasonably infer that the defendant "is

dissembling to cover up a discriminatory purpose," and given that the employer is best placed to

provide the true explanation for its actions, "discrimination may well be the mostly likely

alternative explanation."  *Reeves*, 530 U.S. at147.

Yet the burden of persuasion remains with the plaintiff.  *McDonnell Douglas*, 450 U.S. at

253.  "The ultimate question is whether the employer intentionally discriminated, and proof that

'the employer's proffered reason is unpersuasive, or even obviously contrived, does not

necessarily establish" intentional discrimination.  *Reeves*, 530 U.S. at146-47.  To find for the

plaintiff, the fact-finder must not only "*dis*believe the employer" but must also "*believe* the

plaintiff's explanation of intentional discrimination."  *St. Mary's Honor Ctr.*, 509 U.S. at 511

(emphasis in original).

In resolving a defendant's motion for summary judgment, a court should consider "the

strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary judgment]." *Reeves*, 530 U.S. at 148-49 (setting out these factors for courts ruling on motion for directed verdict); *Anderson*, 477 U.S. at 259 ("summary judgment inquiry 'mirrors' that which applies in the context of a motion for a directed verdict"). If no reasonable jury could believe the defendant intentionally discriminated, he is entitled to judgment as a matter of law.

**B. Analysis**

Defendant contends plaintiff has failed to establish a prima facie case of race and/or age discrimination because "nothing about his suspension gives rise to an inference of discrimination." (Def.'s Mem. Supp. Mot. Summ. J. 18.) He suggests that plaintiff has adduced no evidence of similarly situated employees ("comparators") who were treated differently from he, and that absent some alternative basis on which to infer discrimination, plaintiff has not established the third element of his prima facie case. (*Id.* at 18-19.)

In response, plaintiff accurately observes that he need not identify a comparator to make out a prima facie case. (Pl.'s Mem. Opp. Summ. J. 11-12.) *See George v. Leavitt*, 407 F.3d at 412 (to claim that "the plaintiff must show [*inter alia*] that she was treated differently than similarly situated employees" to establish a prima facie case is "not a correct statement of the law"). Yet plaintiff does offer two arguments on the comparator theory.

First, though tacitly admitting they are not similarly situated, plaintiff offers that "younger, white officers charged with much more severe conduct than that alleged to have been committed by Officer Williams [were] treated better and differently." (*Id.*) Second, plaintiff

20

contends that Sergeant Angerome, who was not disciplined for his conduct on March 3, was a similarly-situated employee. (*Id.* at 14.) As an alternative to the comparator theory, plaintiff claims the inconsistencies in his supervisors' and colleagues' accounts of March 3, 2002 "are a strong indicator of mendacity, which gives rise to an inference of discrimination." (*Id.* at 11.)

*1. Comparators*

In this Circuit, employees are similarly situated if "all relevant aspects" of their employment situations, including seniority of position, are "'nearly identical.'" *Neurin v. Addici, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). When the employer claims it took the adverse employment action due to plaintiff's misconduct, similarity of situation requires that the alleged comparators have been "charged with offenses of 'comparable seriousness.'" *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (finding plaintiff's "lack of forthrightness and obedience" not comparable to colleagues' immature behavior and admitted drunk driving).

Here, plaintiff offers three potential comparators: Officers Stalvey and Kolbert and Sergeant Angerome. (Pl.'s Mem. Opp. Mot. Summ. J. 13-14.) Officers Stalvey and Kolbert are white males under forty years of age. (Pl.'s Exs. 21, 22.) Stalvey and Kolbert were criminally charged with assault in domestic violence incidents in 2002 and 2003, respectively, and DPD immediately placed each officer on administrative leave. (*Id.*) A court acquitted Stalvey, and charges against Kolbert were dropped. (*Id.*) The Secret Service disciplined neither officer. (*Id.*)

The Court finds that "inappropriate conduct while on duty" and alleged off-duty physical assaults are not "offenses of 'comparable seriousness.'" *See Holbrook*, 196 F.3d at 261. Plaintiff characterizes his offense as "involve[ment] in a verbal exchange, involving profanity and raised

voices, with a fellow employee or supervisor." (Pl.'s Mem. Opp. Summ. J. 14.) Stalvey and

Kolbert, however, allegedly committed acts of physical violence. (Pl.'s Exs. 21, 22.) Williams

does not dispute that he raised his voice to his supervisor, called him a racist, and declared that "a

black man is always being f***** with." (*See* Pl.'s Ex. 3 at 3; Pl.'s Ex.13 at 1.) This conduct

occurred on duty, in uniform, in a public place and was Williams' second offense. (Pl.'s Ex. 3 at

3; Karpowicz Decl. 4.) By contrast, Stalvey was charged with assaulting his wife in their home,

had no prior disciplinary record, and was adjudicated not guilty. (Pl.'s Ex. 21; Karpowicz Decl.

4.) Kolbert allegedly assaulted a date in a public place while off-duty, but charges against him

were dropped. (Pl.'s Ex. 22.) Stalvey and Kolbert are uniformed officers like Williams, but the

disparate nature and context of their offenses precludes their service as comparators.[14]

   Plaintiff also offers his supervisor, Sergeant Angerome, with whom he engaged in the

instant "verbal exchange, involving profanity and raised voices," as a comparator. (Pl.'s Mem.

---

[14] The Eighth Circuit applies a less stringent standard for comparators:

> To require that employees always have to engage in the exact same offense as a
> prerequisite for finding them similarly situated would result in a scenario where evidence
> of favorable treatment of an employee who has committed a different but more serious,
> perhaps even criminal offense, could never be relevant to prove discrimination."

*Lynn v. Deaconess Med. Ctr.-W. Campus*, 160 F.3d 484, 488 (8 th Cir.1998). While the Court
agrees that such a scenario would, indeed, offend rational principles, the instant case is not so
extreme. Stalvey, who was acquitted, was not suspended. (Karpowicz Decl. 4.) His police
powers were suspended, however, and he was relieved of his weapon, placed on administrative
leave, and banned from the workplace. (*Id.* at 3.) The same administrative measures were taken
with Kolbert, whose Top Secret security clearance was also suspended. (*Id.* at 5.) After a special
investigation, Stalvey was returned to full duty, referred to EAP, and required to complete a
twenty-six week domestic violence course. (*Id.* at 3-4.) Though charges were dropped, the
Secret Service also conducted a special investigation of Kolbert's incident, and he was ordered to
complete an FFD. (*Id.* at 5-6.) Thus, neither officer *clearly* committed a "more serious, perhaps
even criminal offense," and neither received "favorable treatment."

Opp. Summ. J. 14.)   Unlike Williams, Angerome never faced disciplinary action for the events of March 3, (Pl.'s Ex. 12 at 2), but on Williams' account, Angerome initiated the exchange when "he started yelling at [Williams] in public," (Pl.'s Ex. 3 at 3).   Because Angerome was Williams' supervisor, however, their employment situations were far from "nearly identical."   *See Neurin*, 43 F.3d at 1514.   Hence, plaintiff may not raise an inference of discrimination by comparing himself to Angerome, and his comparator arguments fail.

　*2. Mendacity*

　　Plaintiff also suggests that inconsistencies in the various supervisors and officers' accounts of March 3, 2002 indicate "mendacity, which gives rise to an inference of discrimination."   This proposition is flawed for two reasons.   First, plaintiff derives it only by misconstruing Supreme Court precedent.   (Pl.'s Mem. Opp. Summ. J. 11 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511).)   Read in context or standing alone, the cited language clearly applies to a plaintiff's pretext showing, not to his establishment of a prima facie case: if the court disbelieves a defendant's asserted non-discriminatory explanation, "particularly if disbelief is accompanied by a suspicion of mendacity," this disbelief may, "*together with the elements of the prima facie case*, suffice to show intentional discrimination."   *St. Mary's Honor Ctr.*, 509 U.S. at 511 (emphasis added).

　　Second, plaintiff asks the Court to assume that because he, McBride, Angerome, Rosa, and Chappell did not provide identical descriptions of the events of March 3, "the Agency officials" must be lying.   (*See* Pl.'s Mem. Opp. Summ. J. 11.)   Yet eyewitness accounts of an event - particularly with regard to largely immaterial details like those plaintiff cites, *see supra* notes 2, 3 - may differ for a variety of reasons, such as differences in the witnesses' ability to

perceive, recall, or narrate.  *Cf.* Wright & Gold, *Federal Practice & Procedure:  Evidence* § 6097

(1990 & Supp. 2007) (discussing bases for attacking a witness's recollection on cross-

examination).  On summary judgment, plaintiff is entitled to "all *justifiable* inferences" in his

favor.  *Anderson*, 477 U.S. at 255 (emphasis added).  Williams would have the Court infer his

entire chain of command is lying on the strength of only his own, uncorroborated testimony.

This is not a justifiable inference.  Absent evidence or authority that would compel the Court to

suspect deliberate falsehoods, neither of which plaintiff has offered, the Court will not read

inconsistency as "mendacity."

     *3. Elimination of Most Common Legitimate Reasons*[15]

     In failure to hire and discriminatory discharge cases, the D.C. Circuit permits a plaintiff to

raise an inference of discrimination by discrediting "'the two most common legitimate reasons on

which an employer might rely" in taking the challenged action.  *Stella v. Minetta*, 284 F.3d at

145; *George v. Leavitt*, 407 F.3d at 412.  "*Elimination* of these reasons . . . is sufficient, absent

other explanation, to create an inference that the decision was a discriminatory one."  *Int'l Bhd.*

*of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (emphasis added).  Though the

term "elimination" implies a demanding standard of proof, it must be interpreted in light of the

posture of the case.  Plaintiff need only "eliminate" the most common reasons by a

preponderance of the evidence.  *See Burdine*, 450 U.S. at 253-54 (in a failure to hire case, "[t]he

prima facie case [which requires a plaintiff to show by a preponderance of the evidence that,

*inter alia*, she was qualified for a then-vacant position] serves an important function in the

---

[15] The parties do not address this issue in their briefs, but the Court will evaluate it for
thoroughness' sake.

litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's

rejection").

The most common legitimate reason on which an employer might rely in disciplining an

employee would be that the employee had violated an employment regulation or policy. Another

court in this district has held that:

> to establish a prima facie case of discrimination in connection with disciplinary actions under the *McDonnell Douglas* approach, plaintiff must prove that either he did not engage in the conduct for which he was disciplined or, if he did, that employees not of his protected group who engaged in comparable acts were not punished in a similar fashion.

*Plummer v. Bolger*, 559 F. Supp. 324, 329 (D.D.C. 1983) (Richey, J.), *aff'd without opinion by*

721 F.2d 1424 (D.C. Cir. 1983).  *See also Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06

(4th Cir. 1985), *cert. denied*, 472 U.S. 1021 (1985) (plaintiff may establish prima facie case by

showing he was disciplined more severely than person of a different "race, color, sex, religion, or

national origin" who engaged in the same prohibited conduct).  Similarly, Williams could prove

that: 1) he did not commit the alleged misconduct; 2) the alleged misconduct was actually

protected activity; or 3) the Secret Service enforced the policy Williams allegedly violated in a

disparate manner.

### a. No Prohibited Conduct

Plaintiff contends his actions on March 3 were entirely appropriate - essentially, that he

did not engage in prohibited conduct.  (Pl.'s Ex. 2 at 79-81.)  Plaintiff claims he "responded to

Sgt. Angerome's angry tirade by raising his voice to the same level as Angerome."  (Pl.'s

Statement of Genuine Issues 1.)  In defendant's words, plaintiff "lost his temper and yelled at his

immediate supervisor, Sgt. Angerome."  (Def.'s Mat. Facts Not in Genuine Dispute 1.)  The

disagreement here is a purely semantic one; no dispute exists that plaintiff raised his voice, cursed, and called his supervisor a racist while on duty, in uniform, on Massachusetts Avenue. (*See* Pl.'s Ex. 3 at 3 (Williams' Affidavit) ("I told him he was a racist") ("I acknowledge that I did raise my voice"); Pl.'s Ex.13 at 1 (Williams' Response to Proposed Suspension, May 17, 2002) ("I admit that I made the statement about having to watch my back and that a black man was always being...."); Pl.'s Ex. 29 at 1 (Proposed Suspension Memorandum, May 7, 2002) ("You stated that you 'had to watch your back, that a black man was always being f***** with").)

The May 17, 2002 suspension proposal quotes three Secret Service regulations: 1) "[c]ourtesy or daily behavior that is polite and considerate of others, is required of Secret Service and other Treasury employees in all their dealings with . . . other Federal employees[;]" 2) "[i]t is the duty and responsibility of members to promote harmony among their associates and between subordinates and superior officers[;]"and 3) "[a]ll members, regardless of their position should ensure that every individual with whom they have contact is treated professionally [and] . . . shall at all times maintain decorum and command of temper." (Pl.'s Ex. 28 at 2.) Objectively, whatever may have motivated them, plaintiff's admitted statements and conduct were not "polite," designed to "promote harmony" with his supervisor, or in keeping with "decorum and command of temper."[16] Thus, plaintiff cannot demonstrate he did not engage in facially prohibited conduct.

> *b. Protected Activity*

---

[16] In his Statement of Genuine Issues, plaintiff disputes that he violated any such policy. (Pl.'s Statement of Genuine Issues 1.) Given his admission, it appears he disputes not *what* he did but rather *why* he did it.

Plaintiff also contends, however, that his conduct was justified under the circumstances: "The Standards of Conduct are not meant to silence protests to racism and disparate treatment . . . I pointed out to Sgt. Angerome the racist nature of his words and actions.  I did so in an unambiguous way."  (Pl.'s Ex. 30 at 2.)  Plaintiff is correct that by showing his admitted conduct was a "protest[] to racism and disparate treatment," protected activity under Title VII, he might have raised an inference that subsequent discipline for that conduct was discriminatory.  *See* 42 U.S.C. § 2000e-3(a) (prohibiting discrimination against an employee "because he has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title").

Yet such a showing necessarily requires some evidence that Angerome engaged in discrimination to prompt plaintiff's outburst, and plaintiff has offered none.  Williams alleges that Angerome "yelled" for his mileage and location "in a very demeaning tone" and seemed "agitated and upset," (Pl.'s Ex. 2 at 55; Pl.'s Ex. 3 at 2.)  Williams further claims Angerome's request for his location and mileage over the radio had "no legitimate basis" and derived from an "invidious reason." (Pl.'s Mem. Opp. 21).  According to Williams, Angerome slammed his cruiser door and approached him in "an extremely agitated state."  (Pl.'s Ex. 3 at 3; Pl.'s Ex. 13 at 1.)  Angerome then allegedly "started yelling" at him, demanding to know where he had been. (Pl.'s Ex. 2 at 58; Pl.'s Ex. 3 at 2.)  Plaintiff denies that no reasonable person would perceive a causal connection between this alleged conduct and plaintiff's race or age, and he insists Angerome "sought [him] out [] to vent his racist and ageist hostilities."  (Pl.'s Statement of Genuine Issues 3.)

Though on summary judgment the Court must accept the non-moving party's evidence as true, it need not give credence to conclusory allegations lacking any factual basis in the record. *Dist. Intown Props. Ltd. Pshp. v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999). *See also Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir. ) (summary judgment properly granted where "evidence of religious animus consisted merely of conclusory allegations in [plaintiff's] own affidavit"). To support his version of events, Williams relies on: Angerome's use of a curse word to another officer while at CC earlier in the evening, (Pl.'s Ex. 7 at 2); deposition testimony from DSAIC Knight, who was not present in CC or on the scene on March 3, that "Sergeant Angerome apparently was upset that Officer Williams had not responded to the radio calls," (Pl.'s Ex. 27 at 35); and McBride and Rosa's testimony that they could think of no situation in which an officer would be asked for his mileage and location other than when transporting a female prisoner (Pl.'s Ex. 6 at 48 (McBride's Dep.); Pl's Ex. 9 at 27-28 (Rosa's Dep.)).

At most, plaintiff's evidence suggests that Angerome may have been upset with Williams when he arrived at Massachusetts Avenue and that Angerome's mileage and location requests were unusual. Notably, plaintiff offers no evidence that Officer Chappell, the only other person present for the confrontation, recalls observing Angerome yelling at Williams. (*See* Pl.'s Ex. 7 (Chappell's Affidavit); Pl.'s Ex. 13 at 3-4 (Chappell's Witness Statement for Williams' Response to the Proposed Suspension). Furthermore, even assuming Angerome *did* yell at him, Williams offers nothing beyond his own conclusory assertions to prove that Angerome did so *because of his race and/or age*.[17] (*See* Pl.'s Statement of Genuine Issues 3 (citing pages in

---

[17] Williams claims that "plenty of times there were white officers that was not answering their radio," and that rather than "try to embarrass them or humiliate them or belittle them" by calling for their location and mileage over the radio, other officers had tried to locate them via

plaintiff's affidavit describing his confrontation with Angerome).)

Moreover, plaintiff's own testimony supports at least three other equally plausible motivations for Angerome's conduct. *See Carpenter v. Fannie Mae*, 165 F.3d 69, 72 (D.C. Cir. 1999) (when he offers evidence on which a jury might find he was fired for "an unsavory but lawful alternative reason, . . . plaintiff cannot get to the jury"). First, Williams acknowledges that Angerome was his supervisor; that due to his radio's malfunction, he could not be located for much of the night; that he initially provided inaccurate location information to Angerome; and that when Angerome found him he was outside his assigned patrol zone. (Pl.'s Ex. 2 at 52; Pl.'s Ex. 3 at 2; Pl.'s Dep. 38.) Reasonably, Angerome might have been concerned for Williams' whereabouts or angry with Williams over his misdirection and Williams' deviation from his assigned patrol.

Second, plaintiff contends Angerome "was unhappy [at DPD], and so I guess he decided to spread it around." (Pl.'s Ex. 2 at 122.) Williams alleges Angerome "tr[ied] to make things miserable" for those, like himself, who enjoyed their jobs, (*id.*), thus providing another

---

cell phone. (Pl.'s Dep. 161.) He cites Sergeant Rosa as an example but provides few details and does not indicate that Angerome was Rosa's supervisor or was on duty at the time. (*See id.*) In his response to defendant's interrogatories, he identifies Officers Peckay and Hughes as comparators. (Pl.'s Ex. 31 at 5.) The only other mention of Hughes in the record occurs in Williams' affidavit, wherein he claims that around April 17, 2002, Hughes and another white officer were in a strip club while Angerome and CC were trying to reach them by radio. (Pl.'s Ex. 3 at 4-5.) Williams avers that Angerome knew of their whereabouts and "did nothing to them." (*Id.* at 5.) Again, Williams provides no additional details and does not support his own vague description of the incident with any further evidence. Peckay is mentioned twice. In his affidavit, Williams declares that Peckay, who is white, is known for having a problem with anger and for throwing things but has not been disciplined. (*Id.*) Angerome noted in his affidavit that Peckay had been relieved of his weapon due to involvement in an off-duty shooting. (Pl.'s Ex. 26 at 6.) Without more, no reasonable jury could find Williams' generalized assertions demonstrate Angerome would likely have treated plaintiff differently under the circumstances had he been younger and white.

29

explanation for Angerome's alleged behavior.

Third, in his deposition testimony, plaintiff describes a rift within DPD concerning the organization's mission: some officers, including Angerome, believed DPD officers should engage in proactive police work as well as checking security at embassies and other diplomatic sites; others, including Williams, "didn't fight management" and focused exclusively on the core mission.[18]   (*See* Pl.'s Dep. 27-29.   *Accord* Pl.'s Ex. 8 at 67-69 (Angerome's Deposition) ("some officers are more police orientated and others are not, and H.L. Williams had the reputation of not being police oriented").)   This mission-related disagreement might reasonably have also motivated Angerome's alleged conduct.

Hence, plaintiff has adduced no evidence beyond his own conclusory allegations that Angerome confronted him with discriminatory animus, and the evidence he does offer suggests at least three other plausible, non-discriminatory reasons for Angerome's alleged conduct.   Thus, plaintiff has not shown his responsive conduct was protected activity, and he cannot "eliminate" his own misconduct as a basis for the suspension.

### c. Disparate Enforcement

Finally, plaintiff avers "[the suspension] would not have happened if [he] were of a different race and if [he] were younger."   (Pl.'s Ex. 3 at 4.)   Yet plaintiff cannot show by a preponderance of the evidence that younger, white employees "engaged in comparable acts but

---

[18] Though plaintiff initially contended that "most" officers in the first group were white and that "all the black[s] and I" were in the second group, (Pl.'s Dep. 27), he later added that "a lot of white officers" were also in the second group, (*Id.* at 29).   Plaintiff's own statements thus seem to indicate this divide crossed racial lines, and absent any amplifying information in the record, no reasonable jury could find by a preponderance of the evidence that these generalized assertions indicate Angerome acted with discriminatory intent.

were not punished in a similar fashion." *Plummer*, 559 F. Supp. at 329.  As discussed above, Officers Stalvey and Kolbert, two younger white employees, did not engage in acts comparable to those for which Williams was disciplined.

Williams also seems to contend "that [no] other officer in the Secret Service was *ever* disciplined for raising his voice to a supervisor or using profanity with a supervisor."[19]  (Pl.'s Mem. Opp. Summ. J. 13.)  To demonstrate that these were common occurrences, Williams cites to McBride and Angerome's depositions, (*id.*), but their testimony does not support his point.

Williams directs the Court to Angerome's testimony that he and other officers used profanity at times, even while "on scene," (Pl.'s Ex. 8 at 61), but Angerome, who is a supervisor, also stated no officer had ever yelled or cursed at him, (Pl.'s Ex. 8 at 53.)  McBride testified that to his knowledge no officer had been disciplined for being argumentative or angry "with regard to having to stand post at an empty building[;]" "about having to do a foot patrol when it was raining[;]" or "about having to come in for four additional hours or stay [over]."  (Pl.'s Ex. 6 at 132-133.)  The Secret Service did not discipline Williams for any of these reasons.  (*See* Pl.'s Ex. 28 at 1-4.)  Williams directs the Court to one further portion of McBride's testimony:

> Q. Okay. Was it – do you recall the race of the person who was suspended for being disrespectful to a superior?
>
> A. The ones I'm thinking about, they were all white.
>
> Q. Do you recall specifically that someone was suspended for being disrespectful to a superior?
>
> A. No.  I can't think of one.

---

[19] Plaintiff does not specifically so assert but instead decries defendant's failure to produce contrary evidence in discovery.

(Pl.'s Ex. 6 at 124.)  Almost immediately thereafter, McBride admitted that he "wouldn't have first or even secondhand knowledge" of the reasons for which officers had been suspended. (Pl.'s Ex. 6 at 124.)  At most, this equivocal testimony comprises a mere "scintilla of evidence" that cannot defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252.

Because plaintiff has offered no evidence from which a reasonable jury could infer race or age played a role in his suspension, the Court must grant summary judgment for defendant on plaintiff's discrimination claims.

## III. Hostile Work Environment

### A. Applicable Legal Standards

In addition to discrete acts of discrimination, a plaintiff may seek relief under Title VII for a hostile work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.  Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Id.* at 22.  To establish a prima facie case under this theory, a plaintiff must show: 1) that he belongs to a protected class; 2) that he suffered unwelcome harassment; 3) that the harassment occurred due to his membership in the protected class; 4) that "the harassment affected a term, condition, or privilege of [his] employment;" and 5) that his employer knew or should have known about the harassment but failed to act to prevent it.  *Brooks-Miller v. England*, 357 F. Supp. 2d 197, 201 (D.D.C. 2004) (Lamberth, J.).

The Supreme Court has referred to Title VII as a "broad rule of workplace equality,

32

*Harris*, 510 U.S. at 22, but as the fourth element makes clear, Title VII does not mandate

workplace *civility*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  "[M]ere abusive

behavior in itself is not actionable."  *Brooks-Miller*, 357 F. Supp. 2d at 201.  Nor may an

employee's complaint plead only ordinary workplace tribulations, such as "the sporadic use of

abusive language, [] jokes, and occasional teasing."  *Faragher*, 524 U.S. at 788.  Indeed, "Title

VII does not prohibit all verbal or physical harassment in the workplace."  *Oncale v. Sundowner

Offshore Servs.*, 523 U.S. 75, 80 (1998).

Rather, a cognizable hostile work environment is one permeated "with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment."  *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999).  In

assessing whether a work environment meets this standard, a court should weigh "the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Harris*, 510 U.S. at 23.  Moreover, the challenged workplace environment must

be both subjectively and objectively abusive; that is, it must be "one that a reasonable person

would find abusive or hostile, and one that the victim in fact did perceive to be so."  *Faragher*,

524 U.S. at 787.

When an supervisor creates an actionable hostile work environment, his employer faces

vicarious liability.  *Id.* at 807.  Absent a tangible employment action, *see supra* note 11, however,

the employer may raise an affirmative defense ("the *Faragher/Ellerth* defense") if: 1) "the

employer exercised reasonable care to prevent and [promptly] correct" the harassment; and 2)

"the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer" or to otherwise avoid injury.  *Id.*

### B. Analysis

Defendant's motion for summary judgment attacks the third and fourth elements of

plaintiff's prima facie case.  (*See* Def.'s Mem. Supp. Mot. Summ. J. 21-23.)  First, defendant

asserts plaintiff "has adduced no evidence to support a jury verdict that the alleged harassment

was done because of Plaintiff's race or age."  (*Id.* at 22.)  Second, defendant claims plaintiff

"cannot show that the allegedly harassing actions of the agency employees [were] anywhere near

severe enough to qualify as a hostile environment under the applicable legal standard."  (*Id.* at

21.)  Additionally, defendant pleads the *Faragher/Ellerth* defense.  (*Id.* at 23-24.)  Because the

Court agrees with defendant's first two arguments, it need not reach the affirmative defense.

Plaintiff admits his harassment claim rests "entirely" on the following events: "his nine-

day suspension, alleged teasing, alleged isolation, being sent to a fitness-for-duty medical exam,

and allegedly finding a picture of a graduate's cap and gown on his locker."  (Pl.'s Statement of

Genuine Issues 2; Def.'s Mat. Facts Not in Genuine Dispute 2-3.)  In his opposition to

defendant's motion for summary judgment, he indicates his harassment claim also extends to the

anger management course he attended.  (*See* Pl.'s Mem. Opp. Summ. J. 31-33.)  To survive

summary judgment, plaintiff must offer evidence of pervasive "harassment [that] affected a term,

condition, or privilege of [his] employment," which a reasonable jury could find causally

connected to his race or age.[20]  *Brooks-Miller*, 357 F. Supp. 2d at 201.  He has not done so.

---

[20] The D.C. Circuit has not recognized an ADEA cause of action for hostile work
environment.  *See, e.g.*, *Easton v. Snow*, No. 04-02038, 2006 U.S. Dist. LEXIS 42909, at *16
(D.D.C. June 26, 2006) (Kennedy, J.).  This Court does not do so here.  The parties have phrased
their arguments in terms of both race and age, however, and given that plaintiff's claim would
fail under an analogous ADEA cause of action as well as under Title VII, the Court will refer to

*1. Nine-Day Suspension*

As the Court has explained above, plaintiff has not offered evidence from which a reasonable jury could infer his suspension was causally related to his race or age. As such, the suspension could not have contributed to a "*discriminatorily* abusive work environment." 510 U.S. at 22 (emphasis added).

*2. Teasing, Isolation, and Locker Picture*

In his deposition, Williams implied that even he believed the teasing, isolation, and locker picture were not race- or age-related. (Pl.'s Dep. 162-63.) Rather, he stated, "I think they was [sic] doing this because of the embarrassment of being sent through the process of seeing a psychiatrist . . . ." (*Id.* at 162.) He speculated: "I think if I had been a white officer, I think they would have been a little bit more sympathetic about it." (*Id.*) In his opposition to defendant's motion for summary judgment, plaintiff clarifies as follows:

> . . . Officer Williams is not alleging that his fellow officers who teased, humiliated and ostracized him did so because he is black and over 40. Rather, that humiliation was the consequence of his discriminatorily being subjected to the requirement to attend anger management and to attend a fitness for duty examination.

(Pl.'s Mem. Opp. Summ. J. 33.) Plaintiff evidently concedes the teasing, isolation, and locker picture were not race- or age-related. Moreover, nothing in the record indicates Williams' coworkers ever explicitly or implicitly made reference to his race or age, and he has not offered evidence that officers who were younger and/or of a different race and who attended anger management and/or an FFD were treated differently than he.

---

both race and age in its analysis. *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996) (adopting essential elements for ADEA hostile work environment claim, including that "[t]he employee was subjected to harassment, either through words or actions, *based on age*" (emphasis added)).

Even had Williams offered some evidence to raise an inference that the alleged teasing, isolation, and locker picture were discriminatory, the Court finds these incidents and behaviors are just the sort of ordinary workplace tribulations for which *Faragher* forecloses recovery. 524 U.S. at 788 ("sporadic use of abusive language, [] jokes, and occasional teasing" are not actionable).[21] Hence, plaintiff cannot rely on these incidents to show a hostile work environment.

### 3. Anger Management Classes & FFD

Under *Faragher*, Williams' harassment claim must rest on conduct that a reasonable person would find created a pervasively hostile and abusive work environment and that he subjectively perceived as creating such an environment. 524 U.S. at 787. His evidence satisfies neither requirement.

Helen Pitts, an EAP counselor, recommended that Williams attend an anger management course based on reports of his confrontation with Angerome and on conversations with Williams when they met a few days after the confrontation. (Pl.'s Ex. 34 at 1.) She described the course he attended as "not specifically designated for persons who have problems with anger" and observed that attendees had generally provided positive feedback. (*Id.* at 2.) Though Williams did share his "allegations of harassment" with Pitts, Williams described the anger management class to her as "most informative" and "helpful." (*Id.*) Hence, Williams' own evidence indicates he did not subjectively perceive this class as harassment.

Moreover, the Court finds that absent a presumption of discriminatory purpose, a

---

[21] *See also Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 55 (D.D.C. 2007) (Sullivan, J.) (alleged harassment, including placement of drawing on locker depicting employees as KKK members, receiving Nazi salutes from coworkers, and silent treatment by other officers, was not sufficiently severe or pervasive to support hostile work environment claim).

reasonable person would not perceive mandated attendance at an anger management course as

harassment. Nearly all employers require their employees to attend some type of behavior-related

training.  DSAIC Knight testified averred that "[s]ince approximately 1992, all Secret Service

employees [have been] required to attend diversity training," (Pl.'s Ex. 11 at 13), and Sergeant

Angerome testified that "all supervisors have to go to anger management class," (Pl.'s Ex. 8 at

109).  Objectively, the requirement that Williams attend anger management classes can only be

viewed as harassment if one assumes it was levied for a discriminatory reason.

      Williams has not shown that it was.  Helen Pitts, an EAP counselor not part of his

management chain, initially recommended that he attend an anger management course, (Pl.'s Ex.

34 at 1), and both the psychologist and the psychiatrist who examined Williams during his FFD

recommended that he continue to do so, (Pl.'s Ex. 16 at 2.)  Williams offers nothing to show that

these recommendations were based on his race or age.  Thus, Williams cannot rely on the anger

management classes in his hostile work environment claim.

      Similarly, though a reasonable person could perceive an intensive, three-appointment, full

physical and psychiatric exam as harassment, and though Williams claims that he did, he cannot

raise an inference that Knight ordered the FFD for a discriminatory reason.   He simply offers no

evidence to link the FFD to his race or age.  Rather, plaintiff revealingly argues:

> Sgt. Angerome's discriminatory feeling toward Officer Williams was the reason the
> March 3rd incident was initiated, and that incident then founded all the subsequent
> harassment to which Officer Williams was subjected.  *But for that incident, Officer
> Williams would not have been harassed based on his race and age*, which is evidenced by
> the fact that the harassment began after March 3, 2002.

(Pl.'s Mem. Opp. Summ. J. 33 (emphasis added).)[22]  Plaintiff's hostile work environment thus rests on a "fruit of the poisonous tree" theory: he alleges workplace harassment *not* due to his race or age but rather due to his March 3 confrontation with Angerome; because he alleges Angerome acted with discriminatory animus, however, he suggests the "fruits" of that discriminatory encounter comprise an actionable hostile work environment.  Leaving this novel theory aside, as stated above, Williams has adduced no evidence beyond his own conclusory allegations that Angerome discriminated against him based on his race or age, and the evidence he does offer suggests at least three other plausible, non-discriminatory reasons for Angerome's alleged conduct.

Hence, plaintiff has not shown that any of the alleged harassment was race- or age-related, or that taken individually or together, the alleged incidents created or contributed to a pervasively hostile and abusive working environment.

## CONCLUSION

For the forgoing reasons, this Court concludes plaintiff's evidence presents no genuine issues of material fact requiring submission to a jury, and the Court must grant defendant's motion for summary judgment on all claims.

A separate order shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, June 27, 2007

---

[22] *See also* Pl.'s Statement of Genuine Issues 2 (admitting that "the incidents allegedly constituting a hostile work environment . . . related only to Plaintiff's behavior during the incident on March 3, 2002, his participation in an anger management course, and his views on the role of the Uniform Division in doing general police work in addition to its protective mission").)